IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:
:
SARA NOSHAFAGH
:

v.                          :   Civil Action No. DKC 11-3038

:
ISIAH LEGGETT, et al.
:

**MEMORANDUM OPINION**

Presently pending and ready for review in this employment discrimination case is the motion for summary judgment filed by Defendants Isiah Leggett and Montgomery County Fire & Rescue Service ("MCFRS").  (ECF No. 13).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  As will be discussed, each of Plaintiff Sara Noshafagh's claims fail either because she did not exhaust her administrative remedies (at all, as to some claims, or in a timely manner, as to others); because the complained of treatment is not actionable; or because she does not produce evidence of a material fact.  Thus, the motion for summary judgment will be granted.[1]

---

[1] Also pending is a motion filed by Defendants to strike certain exhibits submitted by Noshafagh in opposition to their motion.  (ECF No. 15).  Because Defendants are entitled to the relief they seek even if the contested exhibits are considered, the motion to strike will be denied as moot.

I.  **Background**

A.  **Factual Background**

Except as otherwise noted, the following facts are either uncontroverted or taken in the light most favorable to Plaintiff Sara Noshafagh.  Noshafagh was born in Iran and immigrated to the United States in 1997.  (ECF No. 14-2, Noshafagh Decl. ¶ 2). MCFRS is a division of the local government for Montgomery County, Maryland.  (ECF No. 13-1, Radcliffe Aff. ¶ 4).   In 2006, MCFRS hired Noshafagh as an Office Services Coordinator ("OSC") to work on the 12th Floor of its offices in Rockville, Maryland.  (*Id.* ¶ 3; ECF No. 13-1, Lohr Aff. ¶ 4).

Liberty Martin, another MCFRS employee who works on the 12th Floor, was a member of the panel that interviewed and hired Noshafagh.  (ECF No. 13-1, Noshafagh Dep., at 35-36).  Noshafagh and Martin initially maintained a friendly relationship.  Later, however, Martin and Noshafagh's relationship deteriorated. According to Martin, Noshafagh became hostile after Martin declared that she could no longer do Noshafagh's work for her. Noshafagh, in turn, contends that Martin became the leader of an extended campaign of discriminatory harassment against her.

The earliest alleged incident of harassment occurred on April 25, 2007, when Noshafagh used a long word in the presence of Martin and Roxana Funes, another 12th Floor OSC.  (ECF No. 14-2, Noshafagh Decl. ¶ 6).  Martin and Funes allegedly "repeated

[Noshafagh's] pronunciation of the word while laughing and making jokes about [her] accent." According to Noshafagh, Martin and Funes have continued this type of behavior throughout Noshafagh's employment without facing disciplinary action.

From April 2007 until 2010, Noshafagh's duties included answering "the 2400 Line," a number used by the general public to contact MCFRS. (ECF No. 13-1, Noshafagh Dep., at 123).[2] Funes was primarily responsible for the 2400 Line, but Noshafagh and other OSC's provided back-up coverage. Beginning in late 2007, the 2400 Line became a source of contention between Noshafagh and some of her co-workers, particularly Funes and Martin. In Noshafagh's view, Funes and Martin used the 2400 Line as a tool to harass and belittle her. Funes purportedly forced responsibility for answering the 2400 Line to Noshafagh by taking excessive time off; returning late from lunch breaks; and ignoring Noshafagh's rank in the trickle-down order in which OSC's were supposed to provide back-up coverage. (ECF No. 14-2, Noshafagh Decl. ¶ 2). Noshafagh and Funes exchanged many heated emails arguing about the 2400 Line. (*See, e.g.*, ECF No. 13-2, at 35-38). Noshafagh also contends that Martin – who handled the administrative leave calendar for 12th Floor OSC's –

---

[2] At some point in 2010, the 2400 Line was eliminated with the "soft start" of Montgomery County's general 3-1-1 line. (ECF No. 13-1, Lohr Aff. ¶ 5).

scrutinized her leave slips and attendance more closely than other OSC's. Defendants deny that Noshafagh was ever treated differently than other employees with respect to attendance or the 2400 Line. (*See, e.g.*, ECF No. 16-8, Radcliffe Aff. ¶ 12).

Around this time, Noshafagh began keeping notes about her daily tasks, as well as facts relevant to the 2400 Line (*e.g.*, the times when Funes left for and returned from lunch) and other observations regarding her co-workers' activities (*e.g.*, whether someone was friendly on a particular day, whether an employee's late arrival was noted in the administrative leave calendar, etc.). (ECF No. 13-1, Noshafagh Dep., at 43-44). Noshafagh testified that she "wrote everything" in her notes and "didn't miss anything" in order to "stand up for [herself]." (*Id.*).

The parties dispute the specific facts – and in some cases, the occurrence — of many of the other incidents of alleged harassment. For example, Noshafagh contends that Assistant Chief Scott Goldstein used profanity when he spoke with her, but not with any other employees. (ECF No. 14-2, at 2, Noshafagh Decl. ¶ 13). Goldstein admits to using profanity on occasion, but maintains that he does so non-discriminatorily and that he has "never sworn at or to Ms. Noshafagh." (ECF No. 16-8, Goldstein Aff. ¶ 5).

According to Noshafagh, "[a]t the end of 2008," Martin made cat sounds whenever she was alone with Noshafagh in the ladies'

4

room, the elevator, or the hallway. (ECF No. 14-2, Noshafagh Decl. ¶ 14). Martin denies ever doing so. (ECF No. 13-2, Martin Aff. ¶ 10).

On one occasion in 2009, Noshafagh overheard David Steckel, a member of MCFRS management, use the phrase "Iranian bitch" in a conversation with another manager. (ECF No. 13-1, Noshafagh Dep., at 195-96). According to Noshafagh, she is the only MCFRS employee who is Iranian. (ECF No. 14-2, Noshafagh Decl. ¶ 10).[3]

Also disputed is an alleged incident involving Assistant Chief Wayne Courtney and Dr. Michael Beasley, a clinical psychologist at MCFRS who treated Noshafagh. Dr. Beasley avers that he received a phone call from Courtney, who identified Plaintiff "by stating that she was the employee who was from Iran" and "pressed [Dr. Beasley] to disclose Sarah Noshafagh's personal psychological information." (ECF No. 13-5, Beasley Decl. ¶ 6).[4] Dr. Beasley further states that Courtney "would not

---

[3] Although Defendants question Noshafagh's capacity to make this representation, they never specifically dispute that Noshafagh is the only Iranian employed by MCFRS. (*See* ECF No. 15, at 9).

[4] Dr. Beasley avers that he received the phone call from Courtney in 2010. (ECF No. 14-5, Beasley Decl. ¶ 6). The record, however, establishes that Noshafagh began complaining about the alleged phone call no later than October 2009. Notes from an October 26, 2009, meeting between Noshafagh and an MCFRS internal affairs investigator state that Noshafagh reported the incident as occurring "near the end of June or beginning of July 2009." (ECF No. 13-2, at 57).

take 'no' for an answer and kept pressing [him] for information." Specifically, Dr. Beasley represents that Courtney wanted him "to give his professional opinion that Sarah Noshafagh was mentally ill, perhaps paranoid." Dr. Beasley declined to give any information to Courtney. Courtney, in turn, denies "ever contact[ing] Ms. Noshafagh's medical doctor." (ECF No. 13-1, Courtney Aff. ¶ 7).

In 2009, Noshafagh overheard Courtney state that "the problem is this, the rat." (ECF No. 14-2, at 3, Noshafagh Decl. ¶ 15). Noshafagh avers that she "know[s]" that Courtney was referring to her as a rat "because he was staring right at [her] when he said it" and because it occurred "shortly after [Courtney] called Dr. Beasley." (*Id.*). Noshafagh also testified that she overheard Courtney say to a co-worker that "they have a few snake[s] on the floor" and that she knew that he was referring to her because of his earlier "rat" comment. (ECF No. 13-1, Noshafagh Dep., at 177-78).

In October 2009, Noshafagh complained about what she perceived to be a hostile work environment on the 12th Floor. Although Noshafagh refers to this complaint as an EEOC charge in her opposition (ECF No. 13-1, at 42), the evidence establishes that Noshafagh made an internal, verbal hostile work environment complaint to J. Michael Ziegler, an internal affairs

investigator, during a meeting on October 26, 2009. (ECF No. 13-2, Ziegler Aff. & Ex. 1).

On May 5, 2010, Chief Steve Lohr, Plaintiff's direct supervisor, rated Noshafagh as "Below Expectations" on her performance review for the period from May 2009 to April 2010. (ECF No. 14-4, at 6). Specifically, Lohr gave Noshafagh a "Below Expectations" rating for Expectation 4, which involves "[e]stablish[ing] professional relationships and work[ing] collaboratively with others." In the narrative section, Lohr wrote that Noshafagh "has been unable to foster professional relationships with <u>some</u> of those who may not understand or respect her personal values" and that, as a result, "unresolved conflicts exist between [Noshafagh] and others on the 12th floor that prevents professional communication and routine conflict resolution." (*Id.*). Although Lohr rated Noshafagh favorably in other categories, MCFRS policy is to give an overall negative rating to employees who receive a "Below Expectations" rating for any given category. (ECF No. 14-2, Lohr Dep., at 40).

Later that day, Noshafagh sent an email to Lohr in response to her performance review:

> I need to say I have no problem with none of employees at all. As you mentioned SOME of them have issue with me and it is not because of my English Language. It is because I cannot play game as they want because I am not game player. I think after four years working in MCFRS I improved my

> English Language a lot and from the
> beginning that I didn't have any issue about
> understanding my duties or other didn't have
> any issue about work and my English . . .
> The problem of the 12th floor is not
> communicating or cultural issues, the
> problem of 12th is power which some people
> wants to have and act like queens. This
> problem was going on with the other
> employees in 12th floor even before I start
> to work in MCFRS.

(ECF No. 13-2, at 5).

On May 19, 2010, Noshafagh filed a charge with the Maryland Commission on Human Relations ("MCHR"). (ECF No. 14-5, at 33). Noshafagh cited the following as evidence of "harassment and hostile environment based on my national origin (Iranian) and retaliat[ion]": (1) a "hateful" e-mail from Funes about the 2400 Line; (2) the purported cat meowing; (3) the persistence of her co-workers' harassment despite repeated complaints; and (4) Courtney's alleged phone call to Dr. Beasley.

In January 2011, Martin brought in a table-top bell and, for two days, rang it each time Noshafagh walked by. (ECF No. 13-2, Martin Aff. ¶ 12). Martin received a "counseling memo" about the incident from her direct supervisor, Deborah Shaw, which instructed her to stop the behavior or face "progressive discipline." (ECF No. 14-3, at 2-3). Martin avers that she rang the bell to vent her frustrations about Noshafagh's "disruptive behavior." (ECF No. 13-2, Martin Aff. ¶ 12). Martin received an "Exceptional Performance" rating for the

period including January 2011, and her review did not mention the bell-ringing incident. (ECF No. 14-3, at 5-7).

During the period from 2008 to 2011, Martin made no fewer than nine reports to management complaining about Noshafagh's unprofessional behavior, lack of courtesy, and poor work performance. (*See* ECF No. 14-1, at 6-9). Martin testified that her goal was to prompt MCFRS management to "do something" about "the problems [Noshafagh] was causing on the 12th floor." (ECF No. 13-2, Martin Dep., at 38). Noshafagh contends that management always sided with Martin while investigating these reports. (ECF No. 14-2, Noshafagh Decl. ¶ 16). Other than the June 2011 reprimand discussed below, however, Noshafagh was never disciplined as a result of the complaints. (ECF No. 13-1, Noshafagh Dep., at 337).

In or about December 2010, Martin reported that Noshafagh had improperly discussed confidential information with two different MCFRS employees, Ashley Robinson and Jon Krespan. Specifically, Martin alleged that Noshafagh had approached Robinson, a master firefighter, and told her that she had "overheard things from [Assistant Chief] Ed Radcliffe's Office" about Robinson's upcoming Alternative Dispute Resolution ("ADR") hearing. (ECF No. 13-1, at 60). Martin also alleged that Noshafagh told Krespan, a firefighter, that she knew confidential details about his settlement with MCFRS relating to

a job injury. (*Id.*). MCFRS management approved an investigation into Noshafagh's alleged confidentiality breaches in December 2010, although it "was put on hold" until March 2011 because of staffing shortages in the internal affairs department. (ECF No. 16-8, Radcliffe Aff. ¶ 6). Noshafagh did not learn of the investigation until April 2011.

On May 4, 2011, internal affairs investigator Raymond Wojcik issued a report sustaining Martin's allegations. (ECF No. 13-1, at 60-69). In her interview with Wojcik, Noshafagh (1) stated that she did not recall the incident involving Robinson and (2) denied that she ever overheard any confidential information about Krespan's settlement. Ultimately, however, Wojcik credited Robinson's and Krespan's versions of events.

On May 17, Noshafagh filed a second EEOC charge alleging national origin discrimination and retaliation. (ECF No. 14-5, at 34-35). Noshafagh asserted that her negative May 2010 performance review was (1) in retaliation for her hostile work environment complaint and (2) was "part of the paper trail that management is attempting to establish against me," along with the "bogus" charges of sharing confidential information.

On June 7, 2011, Chief Radcliffe delivered a "Statement of Charges" to Noshafagh, informing her that a written reprimand could result from her alleged confidentiality violations, as well as her alleged false statements during the investigation.

10

(ECF No. 13-1, at 70-73).   On June 21, 2011, Noshafagh's attorney responded to the charges by questioning why MCFRS had "sat on" Martin's complaint for several months.  (*Id.* at 74-77). On June 28, 2011, Noshafagh received a formal reprimand for discussing confidential personnel matters and for lying during an internal investigation.  (*Id.* at 78-80).   MCFRS has not investigated or reprimanded any other employee in the past five years for discussing personnel matters.  (ECF No. 14-4, at 8).

On July 11, 2011, Noshafagh filed a third EEOC charge, citing the following as evidence of discrimination and retaliation:  (1) MCFRS management's continued favoritism of Martin during its investigations of Martin's complaints; (2) the written reprimand; and (3) Chief Radcliffe's alleged accusations that Noshafagh is a liar.   (ECF No. 14-5, at 36-37).

### B.   Procedural Background

On October 24, 2011, Noshafagh filed a complaint against Defendants alleging violations of the anti-discrimination and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), as well as a common law claim for intrusion upon seclusion.  (ECF No. 1). Noshafagh later filed an amended complaint with leave of the court (ECF No. 10), and Defendants answered (ECF No. 11).  After engaging in discovery, Defendants moved for summary judgment on

June 5, 2012. (ECF No. 13). Noshafagh filed an opposition (ECF No. 14), and Defendants replied (ECF No. 16).

## II.  Standard of Review

Summary judgment may be entered only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the facts that are presented must be construed in the light most favorable to

the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III. Noshafagh's Title VII Claims

Noshafagh's amended complaint asserts four Title VII claims: disparate treatment based on national origin; hostile work environment based on national origin; retaliatory hostile work environment; and retaliation. As set forth below, Defendants raise multiple grounds for summary judgment as to each of these claims. Several of Defendants' arguments – *i.e.*, failure to plead, failure to exhaust administrative remedies, and untimeliness — limit what theories of liability can be considered in resolving Noshafagh's claims and will be addressed first. As to those claims that are properly before the court, Defendants are entitled to summary judgment because Noshafagh either complains of conduct that is not actionable under Title VII or fails to meet her evidentiary burden.

### A.   Noshafagh Failed to Plead or Exhaust Her Allegations Regarding Promotion Denials and Loss in Job Duties

Noshafagh's amended complaint asserts a Title VII disparate treatment claim based on four theories of liability: the alleged name-calling and animal sounds by her co-workers; the negative May 2010 performance review; the June 2011 written reprimand; and an unspecified "loss of career progression." (ECF No. 10, at 5-6). In their opening brief, Defendants'

substantive arguments as to Noshafagh's disparate treatment claim correspond to these allegations. (*See* ECF No. 13, at 16-19). In her opposition, however, Noshafagh attempts to alter the factual basis for her claim. In addition to the May 2010 performance review and the June 2011 written reprimand, Noshafagh argues for the first time that Defendants engaged in intentional discrimination by denying her applications for an unspecified number of promotions throughout her six years with MCFRS and by purging her job responsibilities as an OSC beginning in summer 2010. (*See* ECF No. 14-1, at 16-19 & ECF No. 14-2, Noshafagh Decl. ¶¶ 17-18). In reply, Defendants contend that Noshafagh failed either to plead or exhaust these newly raised allegations. (ECF No. 16, at 13-17).

Although "the ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered[,] . . . courts are not precluded from considering such issues in appropriate circumstances." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734 (D.Md. 2006). Based on the procedural posture presented here, it is appropriate to consider the arguments raised in Defendants' reply, both of which have merit.

First, the amended complaint does not assert a Title VII claim based on a failure-to-promote theory, nor does it contain any allegations regarding a loss in job responsibilities. (*See*

ECF No. 10). Noshafagh's opposition does not cure these pleading deficiencies because it is well-established that "a plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F.Supp.2d 399, 436 (D.Md. 2006) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). Instead, a plaintiff seeking to amend the complaint at the summary judgment stage must follow the process set forth in the Federal Rules of Civil Procedure. *Id.* Because Noshafagh has not done so here, there are no pending claims based on either of these two theories of liability.

Second, Noshafagh also failed to exhaust these allegations at the administrative level. Title VII requires a plaintiff to file a charge of discrimination with the EEOC prior to filing suit in federal court. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009). The allegations contained in the charge typically operate to limit the scope of any subsequent civil suit filed by the plaintiff. *Evans,* 80 F.3d at 962-63. Specifically, only those claims stated in the initial charge, those reasonably related to the original charge, and those developed by reasonable investigation of the original charge may be maintained in a subsequent lawsuit. *King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581, 583 (4th Cir. 1976).

Consistent with these principles, "a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." *Jones*, 551 F.3d at 300. Likewise, where the EEOC charge and the complaint allege the same type of claim (*e.g.*, race-based discrimination), the formal litigation claim may still be barred if the central factual allegations supporting it were not raised in the EEOC charge. *See, e.g.*, *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005) (national origin-based discrimination claim barred where "administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [her] formal suit"); *Jones v. Republic Servs.*, No. AW-10-cv-1999, 2011 WL 6000761, at *2-3 (D.Md. 2011) (where EEOC charge alleged race-based disparate treatment based on the plaintiff's suspension and termination, claim for race-based disparate treatment based on employer's refusal to grant an alternative work schedule was barred). "At the same time, however, if the factual allegations in the administrative charge are reasonably related to the factual allegations in the formal litigation, the connection between the charge and the claim is sufficient." *Chacko*, 429 F.3d at 509; *see also Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 595 (4th Cir. 2012) (although the administrative

16

charge and the judicial complaint alleged different facts in support of a disability discrimination claim, they involved the same place of work, the same actor, the same type of discrimination, and the same disability).

Here, none of Noshafagh's three EEOC complaints allege that she was denied any promotions within MCFRS, was stripped of any job duties, or otherwise suffered a lack of career progression. Rather, the gravamen of Noshafagh's administrative charges is that her co-workers engaged in a campaign of harassment against her because she is Iranian and because she filed EEOC complaints. With respect to MCFRS management, Noshafagh's EEOC charges assert only that her supervisors sided with her harassers by (1) crediting their false complaints about Noshafagh's behavior and (2) assigning all of the blame for the contentious 12th Floor working environment to Noshafagh. This discriminatory conduct is markedly different than Noshafagh's newly raised assertion that MCFRS rejected her application for numerous promotions during her six years as an OSC. Likewise, Noshafagh's EEOC charges make no reference to any loss in job responsibilities. Moreover, a reasonable investigation of Noshafagh's charges could not have been expected to reveal such conduct, particularly given that one of Noshafagh's primary assertions was that she was being forced to take on *more* responsibilities as a result of her co-workers' harassment.

17

Because Noshafagh failed to either plead or exhaust these two theories of liability, they will not be considered in resolving her Title VII claims.[5]

**B.   Noshafagh Did Not Exhaust Her Claims Relating to the May 2010 Performance Review in a Timely Manner**

Defendants next contend that any claim based on the May 2010 performance review is untimely. Title VII requires a plaintiff to file an EEOC charge within a prescribed limitations period. 42 U.S.C. § 2000e-5(e)(1). In deferral states such as Maryland, that limitations period is 300 days from the date of the allegedly discriminatory act. *Id.* "Courts strictly adhere to these time limits and rarely allow equitable tolling of

---

[5] The current record also does not support a *prima facie* failure-to-promote claim, which requires Noshafagh to establish that: (1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for the position, and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir. 1995). Noshafagh never identifies the positions for which she allegedly applied, nor does she show that she was qualified for those positions. Instead, Noshafagh's evidence consists of (1) a conclusory statement in her declaration that "I have been an OSC for almost 6 years and I have not received any promotion, despite applying for numerous positions at MCFRS" (ECF No. 14-2, Noshafagh Decl. ¶ 18) and (2) several emails from the Montgomery County Office of Human Resources indicating its receipt of her application for certain open positions (ECF No. 14-5, at 1-6). Significantly, however, all of these emails relate to positions within other divisions of the Montgomery County local government, not MCFRS. Hence, even if Noshafagh had properly exhausted her administrative remedies and had adequately plead a failure-to-promote claim, that claim likely would not survive summary judgment based on the present record.

limitations periods." *Khoury v. Meserve*, 268 F.Supp.2d 600, 606 (D.Md. 2003), *aff'd*, 85 Fed.Appx. 960 (4th Cir. 2004).

Here, Noshafagh did not timely exhaust her administrative remedies with respect to her negative performance review. Noshafagh received her "Below Expectations" review from Lohr on May 5, 2010. Although she filed an EEOC charge on May 19, 2010, that charge did not mention her performance review. Instead, Noshafagh focused her allegations on the 2400 Line harassment, the cat meowing by Martin, and Assistant Chief Courtney's purported call to Dr. Beasley. (*See* ECF No. 14-5, at 34-35). Noshafagh did not raise any allegations regarding the May 2010 performance review until she filed her second EEOC charge on May 17, 2011 – well over 300 days after it was issued.

Noshafagh fails to respond to Defendants' untimeliness argument directly, but does state that she checked the box for "continuing action" in each of her three EEOC charges and argues that she "made it clear . . . that the retaliation and discrimination was continuing." (ECF No. 17, at 9). To the extent that Noshafagh is attempting to rely on the "continuing violation" theory, her reliance is misplaced.

The Supreme Court has held that, in the context of a hostile work environment claim, an EEOC charge referring to events outside the statutory time period will be considered timely so long as such events "are part of the same actionable

19

hostile work environment practice" as events occurring within the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002).   This principle does not, however, apply to "discrete acts" of alleged discrimination, each of which requires exhaustion.   *Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.   Each discrete discriminatory act starts a new clock for filing charges alleging that act.").   "Many courts have specifically found performance evaluations to be 'discrete acts' under *Morgan*." *Villaras v. Geithner*, Civ. No. JFM 08-2859, 2009 WL 3418574, at *5 (D.Md. Oct. 20, 2009).

Thus, Title VII required Noshafagh to exhaust her administrative remedies with respect to the May 2010 performance review in a timely manner, regardless of whether it was related to the incidents alleged in her first EEOC charge dated May 19, 2010.   By waiting to raise any allegations about the performance review until a year after it was issued, Noshafagh cannot rely on it here.[6]

---

[6] Even if Noshafagh had timely exhausted her remedies with respect to the May 2010 performance review, she would be unable to refute Defendants' legitimate, non-discriminatory reason for issuing it — *i.e.*, Lohr's observation that she "is unwilling or unable to set aside her differences with coworkers" and fails to "extend an effort at professional communications with certain co-workers and superiors." (ECF No. 13-2, Lohr Aff. ¶ 11).

C.   **Disparate Treatment Based on National Origin**

Due to the procedural deficiencies described above, the only discrete act at issue with regard to Noshafagh's national origin-based disparate treatment claim is the June 2011 reprimand.   Defendants contend that the reprimand did not constitute an adverse employment action and therefore cannot sustain a disparate treatment claim.

To establish a *prima facie* case for disparate treatment, Noshafagh must show:   "(1) membership in a protected group, (2) qualification for the job in question, (3) an adverse employment action, and (4) circumstances supporting an inference

---

Indeed, Noshafagh's burden to show pretext would be particularly high given that the proffered reason is well-substantiated by the record. *See Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 732 (4th Cir. 1996) (in evaluating whether plaintiff has adduced a sufficient quantity of proof to establish pretext, the relative strength of the employer's asserted nondiscriminatory reasons may be considered).

In an attempt to show pretext, Noshafagh argues that Lohr's explanation "could not have been the real reason" for her negative review because Liberty Martin, a similarly situated employee, was not faulted in her review for failing to foster a professional relationship with Noshafagh.   (ECF No. 13-1, at 26).   To demonstrate that employees are similarly situated, "the compared employees must have dealt with the same decision-maker and engaged in conduct of comparable seriousness." *Popo v. Giant Foods, LLC*, 675 F.Supp.2d 583, 589 (D.Md. 2009). Noshafagh does not make such a showing here.   First, Noshafagh does not dispute that Deborah Shaw, rather than Lohr, is responsible for Martin's performance reviews.   Second, it is not clear that Martin engaged in conduct that is comparable to Noshafagh's, as there is no evidence that Martin had conflicts with other co-workers or supervisors on the 12th Floor.

of discrimination." *Smith v. Vilsack*, 832 F.Supp.2d 573, 582 (D.Md. 2011) (internal quotation marks omitted).   An adverse employment action is a discriminatory act that "'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship*, 671 F.Supp.2d 729, 737 n. 6 (D.Md. 2009). Typically, a "reprimand, whether oral or written, does not *per se* significantly affect the terms or conditions of employment," but only constitutes an adverse action if it "works a real, rather than speculative, employment injury." *Jeffers v. Thompson*, 264 F.Supp.2d 314, 330 (D.Md. 2003). Thus, a reprimand becomes an adverse action only "where the employer subsequently uses [it] as a basis to detrimentally alter the terms or conditions of the recipient's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004).

Noshafagh points to no evidence indicating that Defendants ever relied on the June 2011 reprimand to alter the terms or conditions of her employment.   Noshafagh continues to be employed by MCFRS and testified that she has not experienced any decrease in pay, hours, or benefits.   (ECF No. 13-1, Noshafagh

Dep., at 369).   For the reasons already discussed, Noshafagh's allegations that she has been denied promotion opportunities and has lost job responsibilities are not properly before the court. Even if these allegations were considered, however, the record does not evince any connection between the June 2011 written reprimand and any promotion denial or reduction in Noshafagh's job duties.   The emails Noshafagh relies on as evidence of her promotion denials are all dated 2009 or earlier – well before she received the reprimand.   (*See* ECF No. 14-5, at 1-6). Likewise, Noshafagh avers that she began losing job responsibilities in summer 2010 (ECF No. 14-2, Noshafagh Decl. ¶ 17), indicating that the June 2011 reprimand played no role in the alleged purging of her duties.

Even if she could establish that the written reprimand constituted an adverse employment action, Noshafagh fails to rebut Defendants' legitimate, non-discriminatory justification for issuing it.   Under the familiar *McDonnell Douglass* three-step framework, once a plaintiff establishes a *prima facie* disparate treatment case, the burden then shifts to the employer to provide some legitimate, non-discriminatory reason for the disputed action.   *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).   If the employer can do so, the burden shifts back to the employee, who must demonstrate that the reason offered is, in fact, a pretext for

discrimination. *Id.* In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

Here, MCFRS reprimanded Noshafagh based on its conclusion that Plaintiff improperly discussed confidential personnel information and made false statements during an internal affairs investigation. Because this justification is national origin-neutral on its face, Noshafagh would bear the burden of demonstrating pretext "by showing [the proffered reason] is a lie and the real reason is based on discriminatory intent." *Vilsack*, 832 F.Supp.2d at 584.

Noshafagh attempts to establish pretext by arguing that the charges against her were unfounded. Although Noshafagh continues to dispute the facts that gave rise to the reprimand, the record establishes that MCFRS's investigator ultimately credited the accounts of Robinson and Krespan. It is not the province of the court to decide whether that decision was "wise" or "correct." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks omitted). Even if MCFRS was mistaken in its factual conclusion, that would not render the stated basis for the reprimand pretextual. *Price v. Thompson*, 380 F.3d 209, 215 n. 1 ("[M]ere mistakes of fact are not evidence of unlawful discrimination. Pretext is a lie, not

merely a mistake." (internal citations and quotation marks omitted)).

Noshafagh also argues that Defendants' proffered explanation is pretextual because she is the only employee to be disciplined for discussing confidential information, even though others have engaged in similar conduct. (ECF No. 14-1, at 30). Noshafagh specifically points to (1) Deborah Shaw's and Liberty Martin's behavior in discussing unspecified confidential information about Noshafagh; and (2) her supervisors' conduct in speaking about confidential personnel manners without regard to whether they could be overheard. Other than conclusory allegations, however, Noshafagh fails to establish that either of these examples involved similarly situated employees who shared the same supervisor and engaged in comparable conduct. *Popo v. Giant Foods, LLC*, 675 F.Supp.2d 583, 589 (D.Md. 2009) ("[T]he compared employees must have dealt with the same decision-maker and engaged in conduct of comparable seriousness."). Hence, Noshafagh cannot establish pretext based on this comparison.

Finally, Noshafagh argues that pretext can be inferred from MCFRS's delay in investigating her alleged confidentiality breaches. Noshafagh observes that, contrary to MCFRS guidelines requiring ethical investigations to "promptly begin," MCFRS waited several months to begin its investigation and waited even

longer to notify Noshafagh of the investigation. (ECF No. 14-1, at 29). Noshafagh is correct that an employer's violation of internal procedures may be evidence of pretext. *See Blasic v. Chugach Support Servs., Inc.*, 673 F.Supp.2d 389, 401 (D.Md. 2009). Notably, however, "a violation is not in and of itself sufficient to prove pretext." *Parris v. Bd. of Educ. of Baltimore Cnty.*, Civ. No. L-09-0704, 2011 WL 3320326, at *4 (D.Md. July 25, 2011). Rather, "[t]o be meaningful evidence of pretext, the violation must be material and significant"; technical violations will not suffice. *Id.*

Defendants present evidence that the delay in the investigation was caused by staffing shortages. (ECF No. 16-8, Radcliffe Aff. ¶ 3). Although the investigation was approved in December 2010, it did not begin until MCFRS hired an additional internal affairs investigator in March 2011. In light of this explanation – which Noshafagh does not rebut – MCFRS's delay can only be described as a technical violation that does not amount to meaningful evidence of pretext. Thus, even if the written reprimand was an adverse employment action, Noshafagh fails to show that MCFRS's reasons for issuing it were pretextual, and Defendants are entitled to summary judgment on Noshafagh's disparate treatment claim.

### D.    Retaliation

Defendants next seek summary judgment on Noshafagh's claim that MCFRS took adverse action against her in retaliation for complaining of discrimination.

As with her discrimination claim, Noshafagh may avert summary judgment using the *McDonnell Douglas* burden-shifting framework. *See Price*, 380 F.3d at 212. To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity, (2) her employer acted adversely against her, and (3) the protected activity was causally connected to the adverse action. *See Holland*, 487 F.3d at 219 (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). "If a plaintiff puts forth sufficient evidence to establish a *prima facie* case of retaliation and a defendant offers a non-discriminatory explanation for h[er] termination, the plaintiff bears the burden of establishing that the employer's proffered explanation is pretext." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (internal quotation marks omitted).

With respect to the first prong of her *prima facie* case, Defendants concede that Noshafagh engaged in protected activity in October 2009 when she complained internally of a hostile work environment, and then again when she filed her formal EEOC charges on May 19, 2010; May 17, 2011; and July 8, 2011.

27

Defendants assert multiple arguments, however, in contending that Nosahfagh is unable to establish the second and third elements of her *prima facie* case.  (ECF No. 13, at 32-34).

Although her opposition is not entirely clear, Noshafagh apparently contends that the following events constitute adverse employment actions, each of which is causally connected to her protected activity:  (1) an unspecified number of promotion denials during her six years at MCFRS; (2) the purging of her job responsibilities beginning in summer 2010; (3) the May 2010 negative performance review; (4) the June 2011 reprimand; and (5) Courtney's alleged phone call to Dr. Beasley.

For the reasons discussed, procedural deficiencies preclude Noshafagh from relying on the alleged promotion denials, the loss in job responsibilities, or the May 2010 performance review in support of her *prima facie* retaliation case.[7]

---

[7] Although there is an exception to the exhaustion requirement for claims of retaliation based on actions that follow the filing of an EEOC charge, *see Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992), "the normal rules of exhaustion" apply where the alleged retaliatory conduct occurred prior to when the plaintiff filed her EEOC charge, *Rogers v. Conmed, Inc.*, No. CCB-09-3397, 2010 WL 3056666, at *5 (D.Md. Aug. 3, 2010).  Here, Noshafagh avers that Defendants began purging her job responsibilities in summer 2010 and submits documents indicating that she was denied promotions within other divisions of the Montgomery County government in 2008 and 2009.  Because such actions took place before she filed one or more of her EEOC charges, the normal exhaustion rules preclude Noshafagh from relying on these allegations in support of her retaliation claim.  *Conmed*, 2010 WL 3056666, at *5 ("If a plaintiff

Assuming, *arguendo*, that Courtney's alleged call to Dr. Beasley would be considered by a reasonable employee to be "materially adverse," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), Noshafagh cannot demonstrate that it was causally connected to her protected activity.   The record establishes that, in asserting her initial hostile work environment complaint in October 2009, Noshafagh identified Courtney's alleged phone call to Dr. Beasley as an incident of harassment that had already occurred.   (ECF No. 13-2, at 57). This sequence of events precludes any causal nexus because, "as a matter of logic and as of law," an adverse employment action undertaken prior to Noshafagh's first protected activity cannot give rise to a retaliation claim.  *Murdock v. Northrop Grumman PRB Sys.*, 162 F.Supp.2d 431, 432 (D.Md. 2001).

All that is left to sustain Noshafagh's *prima facie* case is the June 2011 written reprimand.   A reasonable jury could conclude that the formal, written reprimand might "dissuade[] a reasonable worker from making or supporting a charge of discrimination" against her employer, establishing the second prong of Noshafagh's *prima facie* case.   *Burlington N.*, 548 U.S.

experiences retaliation . . .  before filing an EEOC complaint, there is little reason not to require him to exhaust his claims by including them in his EEOC charge.").

at 68.[8]   As to the third prong, a reasonable jury also could conclude that the written reprimand is causally linked to Noshafagh's protected activity given the temporal proximity between the filing of Noshafagh's second EEOC complaint on May 17, 2011, and her receipt of the written reprimand on June 28, 2011. *See, e.g.*, *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (an employee's firing within three-and-a-half months of her engaging in protected activity was sufficient to establish the causation element).

Nonetheless, as set forth above, Noshafagh fails to refute Defendants' legitimate, non-retaliatory reasons for issuing the reprimand and thus cannot meet her burden to establish pretext. Hence, Defendants are entitled to summary judgment on Noshafagh's retaliation claim.

E. **Hostile Work Environment**

Defendants next seek summary judgment on Noshafagh's national origin-based hostile work environment claim, which

_____

[8] This is so notwithstanding the conclusion above that the June 2011 written reprimand did not materially affect the terms and conditions of Noshafagh's employment and therefore cannot constitute an adverse employment action for purposes of Plaintiff's national origin-based disparate treatment claim. *See Westmoreland v. Prince George's Cnty., Md.*, Civ. No. AW-09-2453, 2012 WL 2446154, at *7, 15 (D.Md. June 26, 2012) (adversity for purposes of Title VII's substantive discrimination provisions represents a higher standard than adversity for the statute's retaliation provision).

alleges that her co-workers' and supervisors' behavior amounted to an abusive campaign of harassment.

To prevail on a discriminatory hostile work environment claim under Title VII, a plaintiff must establish that "(1) the subject conduct was unwelcome; (2) it was based on the [national origin] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer v. Va. Dep't of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc). Defendants challenge the second, third, and fourth elements of Noshafagh's claim.

### 1.   **Noshafagh Fails to Establish Discriminatory Animus**

Defendants first contend that Noshafagh fails to meet her burden to establish that any of the alleged harassment was motivated by discriminatory animus.

To demonstrate that the harassment she suffered was based on her national origin, Noshafagh must show that she was "singled out for adverse treatment by the harasser *because of* her membership in a group protected by Title VII." *Khoury*, 268 F.Supp.2d at 612 (internal quotation marks omitted) (emphasis added); *see also Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) (a plaintiff must show that, but for her membership in a protected class, she would not have been

31

subjected to harassment).    Thus, assuming that a jury would believe Noshafagh's version of events, "the critical question . . . is *why* [Noshafagh's co-workers and supervisors] were intent on making [her] life difficult." *Bhella v. England*, 91 Fed.Appx. 835, 846 (4th Cir. 2004).

Although Noshafagh cites myriad incidents of harassment, only one of the alleged incidents has a direct connection to Noshafagh's Iranian descent:   Dave Steckel's comment referring to Plaintiff as an "Iranian bitch."    Significantly, however, Noshafagh does not allege that Steckel was involved in any of the other alleged harassment she endured.    Absent such a connection, this isolated statement by Steckel – even if it is true – is insufficient to carry Nashofagh's burden of proving that the alleged harassment was motivated by discriminatory animus.   *See, e.g.*, *Bhella*, 91 Fed.Appx. at 846 (plaintiff failed to show discriminatory animus where the evidence did not establish a sufficient connection between co-workers' isolated statements referencing her Indian descent and the harassing behavior of which she complained).

With respect to the remaining incidents of alleged harassment (*i.e.*, the cat meowing, the bell ringing, being referred to as "rat" and "snake," the snickering about her English-speaking abilities, the use of profanity, the false complaints to management, calling her psychologist, singling her

out for different treatment with respect to leave), Noshafagh fails to demonstrate how this behavior has any relationship to her national origin. This conduct – although highly inappropriate – cannot sustain a hostile work environment claim because it is national origin-neutral. In other words, there is no indication that Noshafagh would not have been harassed in a similar way but for her Iranian origin. *See, e.g.*, *Khoury*, 268 F.Supp.2d at 612 (a colleague's negative comment about the plaintiff's English-language abilities was insufficient to establish discriminatory animus where "none of the events [she] describe[d] . . . explicitly refer[red] to [her] . . . national origin"); *cf. Rose v. Son's Quality Food, Co.*, No. AMD 04-3422, 2006 WL 173690, at *4 (D.Md. Jan. 25, 2006) ("[R]acially neutral profanity . . . is not the sort of invective characteristic of a racially hostile environment.").

In an attempt to establish discriminatory animus, Noshafagah conclusorily argues that she "believes that Ms. Martin makes the cat sounds at her because she is from Iran" and to "suggest[] that she is something less than human." (ECF No. 13-1, at 17). It is axiomatic, however, that a plaintiff's mere speculation as to discriminatory animus will not suffice to prove that she faced unwelcome conduct on the basis of national origin; concrete evidence is required. *See, e.g.*, *Nicole v. Grafton Sch., Inc.*, 181 F.Supp.2d 475, 482–93 (D.Md. 2002); *cf.*

*Evans*, 80 F.3d at 959 (a plaintiff's "'own naked opinion, without more, is not enough to establish a *prima facie* case of []discrimination'" (citations omitted)).

This conclusion is reinforced by Noshafagh's own characterization of her conflicts with other 12th Floor employees. In an email to Chief Lohr following her negative performance review, she stated that "the problem" on the 12th Floor is "not communication or cultural issues," but is instead an ongoing power struggle that predated her hire. This statement strongly suggests that factors other than national origin motivated the conduct of Noshafagh's alleged harassers.

Similarly, Noshafagh identifies Martin as the individual primarily responsible for the alleged harassment. At the same time, Noshafagh does not dispute that Martin was part of the interview panel that hired Noshafagh, that Martin knew of her Iranian origin at that time, and that the two initially had a friendly relationship. That Martin only later began harassing Noshafagh is a strong indication that her animosity was motivated by something other than Plaintiff's Iranian origin.

Accordingly, because Noshafagh fails to establish discriminatory animus, Defendants are entitled to summary judgment on her hostile work environment claim.

## 2.   The Alleged Conduct Is Not Severe or Pervasive

Defendants alternatively argue that, even if Noshafagh could establish discriminatory animus, her co-workers' and supervisors' alleged behavior does amount to the extreme conduct necessary to constitute actionable harassment.

There are "both subjective and objective components" to establishing that the harassing conduct was "severe or pervasive" enough to create a hostile work environment. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)).  In other words, "[t]he environment must be perceived by the victim as hostile or abusive, and that perception must be reasonable." *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008).  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23).  Such circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  No single factor is determinative, nor is there a "mathematically precise test." *Id.* at 22.  The "line between a

merely unpleasant working environment . . . and a hostile or deeply repugnant one may be difficult to discern." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996).

There can be no doubt that Noshafagh subjectively perceived her working environment to be hostile and abusive. Viewed objectively, however, the record does not establish that the alleged harassment was sufficiently severe or pervasive. Even if the jury resolved all factual disputes in Noshafagh's favor, the alleged harassment amounts to a series of isolated insults and sporadic teasing. More significantly, the record establishes that Noshafagh contributed to making the 12th Floor a highly contentious and unproductive workplace where co-workers were rude to one another and routinely complained about each other to management. Although undoubtedly unpleasant, such an environment is not actionable under Title VII. *See Hoskins v. Napolitano*, No. RDB-12-0639, 2012 WL 5921041, at *13 (D.Md. Nov. 26, 2012) ("Plaintiff cannot point to anything other than several incidents from different coworkers in which he and the co-worker each were at fault for exchanging exactly the type of 'petty' and 'rude' comments that may make for an unpleasant, but not 'hostile' work environment within the ambit of Title VII."); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) ("[C]omplaints premised on nothing more than 'rude treatment by [coworkers], 'callous behavior by [one's]

superiors,' or a 'routine difference of opinion and personality conflict with [one's] superiors,' are not actionable . . . .") (internal citations omitted) (alterations in original). Accordingly, even if she could establish discriminatory animus, Noshafagh's national origin-based hostile work environment claim would still fail.

In light of this conclusion, Defendants also are entitled to summary judgment on Noshafagh's retaliatory hostile work environment claim. *See Thorn v. Sebelius*, 766 F.Supp.2d 585, 601 n. 19 (the level of severity necessary to succeed on a hostile work environment claim under the discrimination provisions of Title VII is higher than that needed to prevail on a retaliatory hostile work environment claim).

## IV. Noshafagh's Common Law Intrusion Upon Seclusion Claim

Finally, Defendants seek summary judgment on Noshafagh's claim for intrusion upon seclusion, which is premised on Courtney's alleged attempt to obtain confidential medical information about Noshafagh from her psychologist.

Maryland recognizes four forms of the tort of invasion of privacy, including intrusion upon seclusion. *Household Fin. Corp. v. Bridge*, 252 Md. 531, 537-38 (1969). Intrusion upon seclusion is defined as "[t]he intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person."

*Pemberton v. Bethlehem Steel Corp.*, 66 Md.App. 133, 163 (1986) (citing Restatement (Second) of Torts § 652B). "Unlike defamation, the intrusion on seclusion tort deals with the manner in which [the defendant] obtained the information rather than the truth or falsehood of the information itself." *Trundle v. Homeside Lending, Inc.*, 162 F.Supp.2d 396, 401 (D.Md. 2001). Often, the tort involves physical intrusion into a place where a plaintiff has secluded herself (*e.g.*, her home). *See* Restatement (Second) of Torts § 652B cmt. b. Intrusion upon seclusion may also occur by "some other form of investigation or examination into [the plaintiff's] private concerns," such as where the defendant "compel[s] [the plaintiff] by a forged court order to permit an inspection of h[er] personal documents." *Id.*

The parties principally dispute whether a cause of action for intrusion upon seclusion lies where, as here, there is only an unsuccessful attempt to obtain confidential information about the plaintiff. Although Defendants deny that a phone call ever took place, it is undisputed that Courtney did not actually acquire any confidential information about Noshafagh from Dr. Beasley. (ECF No. 14-5, Beasley Aff. ¶ 7). Defendants contend that this failure precludes Noshafagh from prevailing on her claim as a matter of law.

Although the Maryland Court of Appeals has not squarely addressed the issue, courts in other jurisdictions have held

that a defendant must actually acquire confidential information in order for a plaintiff to prevail on an intrusion upon seclusion claim.  *See, e.g.*, *Pascouau v. Martin Marietta Corp.*, No. 98-1099, 1999 WL 495621, at *14 (10th Cir. 1999) (Colorado law) ("The tort of intrusion into seclusion requires more than a mere inquiry that reveals nothing; liability attaches only to an unconsented invasion through physical or other means that actually gleans private information."); *Thomas v. Kansas City, Mo., Police Dep't*, No. 04-0626, 2006 WL 27117, at *12 (W.D.Mo. Jan. 5, 2006) (Missouri law) (rejecting argument that "the ultimate acquisition of the information is not required").  *But see Phillips v. Smalley Maintenance Servs., Inc.*, 435 So.2d 705, 709 (Ala. 1983) (acquisition of information from a plaintiff is not a required element of an intrusion upon seclusion claim).[9]

---

[9]  *Smalley* is factually distinguishable from the instant case.  There, the plaintiff alleged that her employer had repeatedly and frequently invited her into his office, locked the door, and asked questions about her sex life as part of an extended campaign of *quid pro quo* sexual harassment that culminated in the plaintiff's termination.  *Smalley*, 435 So.2d at 706-07.  Although the plaintiff had steadfastly refused to answer her employer's questions, the Alabama Supreme Court held that she was not precluded from prevailing on her intrusion upon seclusion claim merely because the defendant had not actually acquired any information about her sexual experiences.  *Id.* at 708.  The court cited Illustration 6 to section 652B of the Restatement, which states that a photographer invades the privacy of a plaintiff when he calls her every day for a month at inconvenient times asking her to sit for a session.  Hence, the *Smalley* court's conclusion focused primarily on the frequency, timing, and other attendant circumstances of the

The facts presented here are somewhat analogous to *Thomas*, where the plaintiff asserted an intrusion upon seclusion claim based on her employer's unsuccessful attempt to obtain her medical records. *Thomas*, 2006 WL 27117, at *12. There, the employer asked the plaintiff to sign a release form for records relating to her use of antidepressants in connection with a "fit for duty" assessment. The *Thomas* court held that a defendant "must actually obtain private information to establish a *prima facie* case" for intrusion upon seclusion. *Id.* In doing so, the court rejected the plaintiff's argument that the employer's request constituted an intrusion, in and of itself. The court reasoned that a mere request is much less egregious than the facts that typically give rise to a viable intrusion upon seclusion claim.

The reasoning employed by the *Thomas* court is persuasive here. Even when Dr. Beasley's version of events is credited, the alleged intrusion consists of a single, unsuccessful attempt by Courtney to obtain information about Noshafagh's mental health. Although Courtney was apparently quite persistent during the phone call, Dr. Beasley does not aver that Courtney ever threatened him, deceived him, or called him again. As in *Thomas*, this isolated incident – which did not actually result

---

employer's questioning. Here, by contrast, there was only one alleged attempt by Assistant Chief Courtney to obtain confidential information about Noshafagh's mental health.

in the acquisition of any confidential information – is readily distinguishable from the egregious behavior that Maryland courts have held to constitute an invasion of privacy. *See, e.g.*, *Pemberton*, 66 Md.App. at 163 (conducting surveillance via a listening device placed on the plaintiff's motel door could sustain a verdict for intrusion upon seclusion). Accordingly, Defendants are entitled to summary judgment on Noshafagh's intrusion upon seclusion claim.

## V.   Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendants will be granted. A separate Order will follow.

           /s/
           DEBORAH K. CHASANOW
           United States District Judge
